And we'll move on to argument in Mackey v. O'Malley, case number 23-3620. Hello, good morning, your honors. I'm Chad Hatfield, representing Kimberly Mackey in her appeal of her social security disability, denial. Ms. Mackey originally filed this claim April 14, 2011, nearly 14 years ago. For this case, she's had four hearings, three federal district court remands, and the case on appeal is currently before you. Throughout this time period and this process, there have been two conversations taking place in this record regarding two different worlds. One conversation regards the vocational world. Is Ms. Mackey able to show up five days a week at an appointed time and be productive and persist for what she should expect compensation in a competitive work environment? Another conversation that's happening is whether she's able to progress through her treatment plans, whether she's able to leave her house and how often without full-blown panic attacks or vomiting, and whether she's able to sit through her counseling sessions one-on-one with a trained mental health provider, many of which she's known for years, without crying and shaking uncontrollably. The ALJ points out to instances where she's able to leave the house a little bit more, she's able to make it through her appointments, show some progress with her treatment plan, and says these two conversations don't match up. This is not finding inconsistencies. This is ignoring context. This issue was already decided in the previous district court decision, saying it was improper error of law to take rare instances of improvement which were expected in the course of mental health treatment. So can I ask you about that? Because, I mean, one of the unusual things about this case, is it the fourth? I mean, there were three remands or four remands. I guess there were four remands to three different ALJs. That was all by the same district court judge? Or was it a different? Different district court judges. But to what degree does that weigh in here? Because all those remands suggest that the district court, you know, I say that, I guess, plural, at least the different judges, were given a hard look at this, kept sending it back, and then they were satisfied. I mean, I know that there's no technical standard here. We're not giving deference to the district court in the same way that, you know, we might in other cases. But doesn't that sort of suggest that fifth time is the charm? And, you know, the arguments that were made before aren't as relevant here, because the ALJ is presumed to have learned from its experience. Well, Your Honor, there's two things. One, ten years ago, this court addressed this issue in Garrison v. Colvin. And in that specific case, the facts, everything really mirrored that case. We talked about picking out isolated instances in the context of a mental health case. But this is a different question, and I'm interested in it. Yes, and I'll get to that. And they said to remand a case is not to give the ALJ a mulligan, to let them try again to try to discredit the claimant and to try to, again, reject these medical opinions. That would create an unfair system of heads we win, and tails we play again until there's finally a judge who sees the case a little bit differently and does it. We'll see the same arguments that were rejected by this court before, of rare instances, all of a sudden now they're saying, okay, a couple more years, a couple hundred pages more of treatment records, there's a few more instances of leaving the house and proven treatment. Yet there's also a few more instances of medical opinions from treating and examining sources that cannot hold, you know, maintain competitive employment. For example, in the first U.S. District Court case, they said, oh, she went on a trip, a vacation once in this time period. The court said that's not a sufficient basis. This court, the judge this time says, well, in 2020, she went accompanied, visited her sister in Michigan. So now there's two trips, nine years apart. Does that change the overall principle of why it was rejected based on rare instances of being able to have improvement in activities in the case of looking at years, a longitudinal picture? It doesn't. So you have 15 medical opinions, well, you have 15 medical sources, six treating physician statements, six examining source statements, three reviewing statements. Dr. Colby did two examining statements, so there's actually more opinions than that, who all consistently found this. What causes that house to fall? It can't be more of the same errors to more of the reason why the district court said this is error. I mean, that's the law of the case doctrine. You can't just keep arguing the same issue over and over until eventually someone gives you a different result. It just needs a judicial efficiency and it's just not like they said, Garrison, it's an unfair judicial process. No, look, I hear you to some degree, but I just want to be clear. I mean, it doesn't seem like law of the case is the issue because we're reviewing, I mean, social security, as you know, are odd because the district court takes a look at it, but then we review it all de novo. We don't give any deference to the district court. And so it doesn't seem to me that there is law of the case for us in this case. We've never remanded it unless I missed something. I mean, none of those, yeah, this is the first time it's come up to us, right? Well, it's the ALJ's decision that's being reviewed for the first time. The ALJ is the commissioner and the federal district court said it was error for the commissioner to find these errors. So this particular ALJ's decision, a lot of the cases, I mean, he's arguing the same issues that were made before. So it's a failure to follow the order of the court in that way. I mean, you didn't as such make a law of the case or a law of mandate argument. I've had a recent case in which those arguments were made as such. You don't as such make those arguments. Is that right? The arguments were framed. You did make them. What specific directions from the earlier remands were in follow? Or were there any that were in follow? All right. So specifically, cannot reject the claims of claim due to waxing and Not all. In all instances of improvement, all of other instances of declining. So that was either factual determinations that were made at, were there earlier at any of the earlier stages where there are factual conclusions that were rejected and that were then. We five in the later ALJ. Yes, for example, symptom exaggeration was raised a prior ALJ. The US District Court said there was, one provider said possibly an exaggeration, but then did standard objective tests that strongly suggest it was not. And the US District Court said there's not evidence of symptom exaggeration here. This second ALJ went under review now, I shouldn't say second, but this ALJ reviewed now dedicated a page and a half of his decision to symptom exaggeration again. Same thing with the treating source statements.  Nelson must review the notes. It's not enough to say it's inconsistent with the longitudinal picture by picking out a few instances of improvement when she's cycling. That was the basis of the denial. Again, the ALJ, I mean, throughout the whole opinion, the ALJ's basis for denial is I can find some times where she's telling her provider that her treatment's going well. And if I could, I mean, there is the, it's just, it's just really important to look through some of these things cited by the ALJ. July, 2011, this was CAR 325. While Ms. Mackey reported some improvement in functioning, she noticed she was still very anxious and had difficulty getting out of the house before 2 p.m. April, 2013, CAR 687. Ms. Mackey was more stable than previous appointments, but appeared moderately anxious. January, 2015, CAR 75. Though she reported she was doing well, she was very anxious about her upcoming Social Security hearing. When asked about how, the way she managed her anxiety, she stated, I tried to manage it, but I am not doing well. Those are the ones that actually ALJ stated where she was improving. It shows the discrepancy between improving in treatment and actual functioning. When we also look at these statements, she said she was doing well in August of 2013, CAR 1446. Distressed, cognitively impaired, problems with word retrieval, poor sleep and having nightmares, blunted affect and anxious mood. There's not even a month in between saying she's doing well with her treatment goals and having difficulty. Now the judge also has over a year period of a gap of saying there's improvement. And so this is a transit concern. She's going through Child Protective Services. She voluntarily gave her daughter to her sister while she gets her life in order. But you'll see she had concerns of family relations throughout this entire record. What was different this time is that she had to go to a parenting counsel. Sorry. You were on a roll. But I just want to be clear. Every argument you're making now is regarding the medical opinions, right? I just wanted to be, because you have a separate argument that the ALJ improperly discounted portions for testimony. But everything you're going to now is to the medical opinions. Is that right? Not necessarily, Your Honor. It's the same argument the judge makes is that her subjective complaints or the opinions that she cannot maintain attendance is inconsistent with statements she makes or her providers state that she's doing well in her treatment notes. It's the same thing about the two worlds of what Garrison and Colvin specifically addressed when they said you have to be cautious about over-relying on doing well, in quotations, in a medical record because doing well in treatment goals may not necessarily have any impact on vocational functioning, which is exactly what we're seeing here, both subjective complaints and the medical opinions. Can you just close your eyes for me? Because that would be helpful. She has, as I understand it, a slew of medical providers who said that she was seriously impaired in some way, right? Correct. All right. What is the medical evidence that supports that the ALJ pointed to the contrary? I mean, you went through in your brief everything that supported her, but what about the ones that the ALJ regards as demonstrating that she was not, in fact, impaired? I mean, he debunks in various ways all of the ones that said she was impaired or seriously impaired or impaired in specific ways. And then what's left in the record of medical evidence or opinions? Yes. Thank you, Erin. Well, that's what I was trying to articulate. Those same treatment notes that I was reading from, those are the ones the judge was citing to saying she was doing better. You say the record shows she's doing better, the best she's ever performed. And he, therefore, doesn't credit the opinions of the medical providers who said that she couldn't work continuously and so on. So then does he also have, are there also people, medical people in the record who said she could work sedentary or low or light work or whatever? Who are those people? So he gave partial weight to one examining source of Social Security, which other examining sources of Social Security-appointed providers said she could not work. And his weight as a whole opinion is based upon the DDS initial reviews of the record, which is important because those providers were not. So this is what I've never understood. What were they reviewing? They were reviewing the same doctors who, in fact, said that she had these serious impairments? Is that what they were reviewing? No, Your Honor. And that's the conflict. They did not review the majority of all these disabling opinions. There's two conversations in this file. They only give them the one file. They don't let the provider actually weigh in of how she's doing vocationally and give them that. The DDS providers did get to review Dr. Mansfield-Blair, her CE, where she said she would have difficulty with maintaining attendance, difficulty with this, with tuition. ALJ said, well, that's not a specific limitation. Difficulty, what does that mean? And without looking to the context of the other providers who said, hey, she missed four more days of work per month. I mean, some providers said she'd be off task 50% of the time. Other providers said she'd only be off task 26 to 50% of the time. Ms. Mackey herself said she'd isolate 50% of the time in her home. Other times she said, I only have two years. The people who stated, I didn't testify, I guess, but they stated in writing that she could do centering or light work or whatever were all, none of them were examining doctors. Is that right? Even examining. That's correct. There were only people who did review. Right. And what they reviewed was all of these people, doctors or non-doctors, physical therapists, whatever, who said, whose conclusion was that she couldn't do this work. No, they didn't have those opinions to review. They didn't have the dozen. So what were they reviewing? That's what I'm trying to understand. What were they reviewing? They were given some notes, treatment notes. Of what? By whom? It has treatment notes in the file. They make findings of various, some mental health treatment notes. They have some well-checked notes, primary care providers. So the problem is that the same providers whose treatment notes they were reviewing, when asked for their opinion as to what work she could do, that she wouldn't have attendance or whatever. Is that it? I mean, I don't understand what they were reviewing. That's what I'm having problems with. Well, they're reviewing how she would function in a workplace. I mean, there's no doubt. The DHS doctors. Oh, EDS, okay. Who did the reviewing. They were reviewing the medical records of the same doctors or medical providers who later, I guess, gave opinions to the contrary. Is that it? That's it. They're giving a set. I mean, there's many records they did not review, but they were given a set of records from a certain time period during that time period. Like, for example, the later DDS providers, they just reviewed. There was a subsequent claim filed after this case was in federal district court, so they reviewed the new period. One of the providers says, hey, this case is already denied. I'm evoking Chavez. I'm not looking at it, which is not right because it was under review. But still, they just said, we're just going to keep the same thing. Other ones looked at the records just from that earlier period, from a set point in time from when she applied until when they make their decision at six months, eight months, or whenever that, you know, depending on initial reconsideration they make. They don't have any of the treatment records after that until the hearing. They don't have any of the medical opinion records of whether doctors actually feel how she would function in the workplace or under the stress of work to review. So they're given the records to review from a certain set of period, but not the, I mean, of course nothing after that, the medical source opinions. Okay. We'll give you some time for rebuttal, but your time's up. So thank you. All right. Thank you.  Good morning, Your Honors. Elizabeth Peer on behalf of Carolyn Colvin, the Acting Commissioner of Social Security. I do agree with my opponent that this is a record of contrasts, but the contrasts are between the very extreme allegations that the claimant is making, such as that she shakes uncontrollably whenever she encounters strangers to the point of passing out, that she has physical pain to the point where it feels like her bones are breaking or she's screaming out in pain. And at the same time, you have this very consistent record showing that she has been able to deal with many complicated situations throughout the period at issue. She loses custody of her daughter. The alleged onset date is 2009. In 2013, in April specifically, she loses custody of her daughter because of her drinking. And all the records up to that point, including some from Dr. Nelson, show that she's been drinking up to this point. She stops drinking in April 2013 after finally going into a treatment facility. And the records after that show that, yes, this woman has limitations. She definitely has anxiety when she's going out, but the things that she's doing, taking care of her household, taking care of her child, budgeting things, planning and going on vacations, going out to events such as a wedding or a concert. And, yes, it's true these are not, like, daily activities, but as this last ALJ points out, they are in extreme contrast to the kinds of things she's saying limit her ability to work. And, yes, this record is kind of, I guess, extreme in a way that this is the fourth ALJ decision. There were three district courts who looked at it, three different district judges. I believe they were all magistrates. And three different ALJs. The last one was not, I don't think. Okay. The first ALJ looked at the case twice. Then there was a second ALJ and a third ALJ. And I would just like to walk you through the history. The first ALJ decision is in 2012, and the agency itself decided that it wasn't defensible and agreed to remand in a stipulation because the ALJ had not properly addressed the first set of state agency doctors, and that was Martin and me. And those doctors realized the claimant was still drinking, and some of their findings seemed to be contingent on her stopping that. So the agency thought, we need to look at this again. And then we also wanted the ALJ to reevaluate the severity of her impairments at step two and then contingent on what happens in those steps. You agreed to a voluntary remand. Yes. And so that goes back. The second ALJ decision is a little more detailed, but it's the same ALJ. That time the district court didn't make any findings regarding the ALJ's analysis of the subjective symptoms and really didn't address the ALJ's treatment of Dr. Nelson's opinion, which is what is kind of at issue here. Dr. Nelson and probably, I'm sorry, blanking.  Colby, yes, thank you. I was blanking on the name. And, again, the subjective symptom analysis. But that second district court remanded by finding that the first, the second ALJ decision didn't comply with the remand order. And it sui sponte decided that that was based on. Did this one comply with the remand order? I'm sorry? Did this one comply with the remand order? Yes. What about with regard to Dr. Colby, for example? Didn't they basically say the same thing about Dr. Colby that had been said previously? Well, I. . . The reason for the remand? The second. . . This ALJ's decision, because now we're talking about the third, and I didn't get to the third in my sort of outline. Go ahead. Let me finish what you were doing. Oh, okay. So the third ALJ actually notes that the court that remanded on its own didn't actually address the merits of Dr. Nelson's opinion, but sort of found that it was in error because of these treatment notes from a different person who's Ms. May. And then had sui sponte decided that the ALJ didn't deal with Martin and me properly. And that's off the table now. So the third ALJ, who issued a much more comprehensive decision than the other ALJ, and it does, you're right, Your Honor, contains a lot of similarities to this one, but it's also much more fleshed out. There's information that third ALJ decision was 2018. So there's a lot of evidence in this record after that. It was October 2018. Is there, for example, more different evidence from Dr. Colby than there was before? No, because Dr. Colby didn't really treat the claimant. He just looked at her during those state of Washington examination findings. And you asked a question at the end of my opponent's testimony about what kind of evidence those doctors look at. And if you look at page 1581, that is Dr. Colby, he says that he looked at his own prior findings, and I believe there's another one from either. Dr. Colby was an examining psychologist, was that not true? Yes, for the state, not a treating. All right, but he was looking. He did meet her. Yes, and I will point out, as this ALJ goes into considerable detail pointing out, and the last one did too, how the claimant presented to Dr. Colby in a way that she didn't present to anyone else in this record, and that is that she talked about being attacked by ghosts in her home and having physical manifestations of this. And so what did the, there's so many layers here, the last district court opinion before this one say about Dr. Colby? That the ALJ properly addressed Dr. Colby. So the third one, not the one that we're reviewing, but the one before that, said that the ALJ properly addressed Dr. Colby? That is a good question. I don't have a specific answer for that. I do know that that court remanded because of Dr. Nelson, oh yes, Dr. Nelson and Dr. Colby. I do have that.  Yes, the third. The third remand was because of both of them. Yes, and it was. The next ALJ says the same thing the first one, the third one said, and we're back to the same, even though the district court had said that it wasn't persuasive the way it was, then why don't we have to do it again? Well, I think the fourth ALJ decision is actually more fleshed out than the third regarding Dr. Colby. That's what I was asking. Yes. You began by saying it was pretty much the same.  That's why I started that. Yes. So the last time this court was remanded from the district court, which was in April 2020, I believe, that court said to reconsider Dr. Nelson and within the context of Ms. May's treatment records, reconsider Martin and me who are no longer part of the issues here, and then Dr. Colby, and then that the ALJ might want to reconsider some other medical sources in light of those two major re-evaluations, and then also re-evaluate the claimant's subjective allegations. So back to Dr. Colby. The claimant presents there with a very different presentation than she did anywhere else, and I will admit that there are a couple points in the record. I know on page 82, she talks about ghosts here and there, but the way she's talking to Dr. Colby is consistent with a psychosis, and you can see that in Dr. Colby's report. He believes that this woman is psychotic, and that's why he assesses these very significant limitations. The record does not bear that out, and the ALJ appropriately states that this is a very unusual presentation, and I would like to point the court's attention to Dr. Thorpe, who did examine claimant also. And that contrasts with Dr. Colby's testimony. Yes, and Dr. Thorpe literally says the claimant is somewhat cagey in her presentation, and that's on page 928 in the record, and this is in April 2013. The second ALJ decision on pages 499 to pages 500 addresses some of claimant's behavior during the hearing that immediately preceded that case, which is consistent with what Dr. Thorpe says, that claimant's not always presenting herself the same way. That said, all of the ALJs agreed that this claimant is limited. They all assessed residual functional capacities that account for mental limitations. The first one didn't have any physical limitations. The second one found claimant could perform medium work. The third one found light. This one found sedentary. So you can see that these ALJs are looking at the record as it is being upgraded, and they're coming to reasonable conclusions, which is what the final district court judge found. The ALJ's rejection of Dr. Nelson's findings stand that it's inconsistent with the record, that Dr. Nelson doesn't appear to understand Social Security rulings, or just Social Security rules, and that's evident in the way he talks about episodes of decompensation, which are not evident in the record. The ALJ talks about that. The ALJ talks about how Dr. Nelson's opinion is inconsistent with claimant's abilities, and he doesn't really explain why she's as limited as he says. So all of that is still supported by the record. It's all supported by the regulatory process, and it's supported by this court's holdings. And regarding claimants, I would also like to point out, there is the third remand doesn't actually talk about, it seems to agree that Dr. Nelson's findings are, that the ALJ's rejection of Dr. Nelson's finding as being unsupported by the objective evidence is a valid reason. And I might have got the district court order wrong, but it's at pages 246 and 47 in the record. So can you summarize why the third remand happened? I guess it's the third. There were three remands or four? There were four remands. There were three remands and four decisions. Okay. So the last one prior to this one, what were the bases for the district court to send it back? Okay, I think that's the one you're talking about was before the district court upheld, right? Yeah, exactly. The last one that was remanded. Yeah, and that one was? And that was based on Nelson? Yes, Nelson and Colby. And Colby. So this 28-page ALJ decision is very detailed. It really, you can't say that this ALJ is shying away from any of this claimant's allegations. Yes, she does show up to certain treatment functions with anxiety or shaking and whatnot, but she's still able to accomplish all of these things, not only on a daily basis, budgeting her household, taking care of her daughter, going out in public when she says she'll faint when she's around anybody who she doesn't know. All of these things are contrasted by what this record continually shows she's able to do. That's all still supported. And the remands in the past, like the only one that really, I think, holds any water, honestly, from the district court's own actions, is that one right before the district court upheld. And that one wanted the ALJ to, again, address Drs. Nelson and Colby, and he did. And, again, as Judge Nelson pointed out in the very beginning, we have four ALJs and three district court jurists who looked at this and agree that this claimant's not disabled. If at any point in that time a judge had decided to do that. Well, hold on, hold on, because I'm not sure that that's true. I mean, we've got one. I mean, it's true as to the ALJs, but as to the district courts, there's only one, because the other is all remanded. I was going to add to that. At any point, one of those judges could have said, enough is enough. This claimant's a disabled agency. You're getting it wrong. I know, but we could say enough is enough. Yes, yes, you could. But my point is that no one did. And the first two district court orders, one was stipulated. That's completely reasonable. The second one was sui sponte and didn't really go to the merits of the ALJ's discussion of Dr. Nelson or her subjective allegations. The third one finds a problem with Dr. Nelson finally, but it's based on these treatment records from Ms. May, who is the person who, as we've noted, she treated a claimant at Compass, and that's where all of those reports come from, that she's doing exemplary. She's doing a really good job with her treatment. She's learning things. All of that is in this ALJ's decision, and all of it still shows that even though there's a lot of time that's passed here, even though there are several medical sources who kind of piggybacked on each other and didn't really look at this whole record, no one did except, you know, this ALJ and came to the conclusion that this claimant is limited but not disabled. And I think your honors could uphold that decision at this point. Okay. Thank you.  All right. Thank you, your honors. So in conclusion, so obviously this.   Yeah, I need to tell. Yeah, we're giving you two minutes for rebuttal. Thank you. This current ALJ does not mention alcohol as a basis of the decision. This is not an issue. It can't be regarded in this case. Dr. Colby, a different presentation that was specifically addressed in detail by the last FDC decision, said that was error. She reluctantly said that, denied it only upon pressing, and then wished she hadn't said it as she was in the middle of dealing with a CPS battle. So that was specifically addressed. There are no new facts to present to that. The second ALJ just ignored the order of the court, repeated the same erroneous reasoning. Dr. Nelson, Dr. May, specifically the last federal court decision, finding error, specifically said that Dr. Nelson's records were supported by his notes and Ms. May, that there were times she was doing better, times she was doing worse. The ALJ failed to note that. I've gone through, look at our briefing, page 26-27, the opening. Every month the judge says doing better. There's another month right after, right before, she's doing much worse. They bring up the thing that she does well. She's able to manage her budget, go to some meetings. During that time period, car 823, she talks about it. March 2014, tearful and trembling, discussed pattern of anxiety. She throws up, brushing her teeth when it has to go to appointment before noon. So there are different opinions on this record, different ways of looking at this. She says, to claim herself, some days she says she isolates 50% of the days. Other times she says she only has severe anxiety one to two days per month, depends on how often she leaves. They say 26% off tasks. I'm going to say 50% off tasks. Every one of these is disabling. The ALJ's RFC does not contain anything regarding missing work, having to show up late for vomiting, trying to use coping skills. There's none of that. The ALJ seems to say sometimes she's way past what the vocational expert said would be disabling. And other times she's just barely past what would cause her to get fired in the competitive workforce. Everything points to it. It's never been addressed by the judge's ARFC. It's the exact same finding. It's the same thing as Colvin. As we win, as we play again, we'll finally get our result. And Ms. Mackey, who was forced to pay, I mean, paid her Social Security taxes as mandated by everyone, has been waiting 14 years with the same errors being perpetuated through time. Thank you. Thank you. Thank you to both counsel for your arguments in the case. The case is now submitted.
judges: FLETCHER, BERZON, NELSON